UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN<br>APPLE IPHONE SE-IMEI/ESN# 355799075202901, S/N #DX3SW2SLH2XG, MEID #35579907520290 CURRENTLY LOCATED IN EVIDENCE STORAGE AT THE NASHUA, NH, POLICE DEPARTMENT, PANTHER DRIVE, NASHUA, NH | Mag. No. 1:17-mj- 182-01-AJ |

I, Michael Perrella, a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—one iPhone SE described below in ¶ 4 and in Attachment A (hereafter "the Device"), which is currently in law enforcement possession pursuant to a Search Warrant issued in New Hampshire State Court, which is referenced below, and the extraction from the Device of electronically stored information described in Attachment B.

2.      I am a Special Agent (SA) of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am currently assigned to the HSI Resident Agent in Charge, Manchester, New Hampshire and have been employed in that capacity since October 2017.  Prior to this assignment, I was assigned to the Immigration and Customs Enforcement, Office of Professional Responsibility, Resident Agent in Charge, Portsmouth, NH, since July 2006; I served at the ICE-HSI Special

1

Agent in Charge, Boston, Massachusetts from March 2003 to July 2006; and served in several capacities with the legacy Immigration and Naturalization Service (INS) to include Special Agent and U.S. Border Patrol Agent from 1996 to 2003.  My current duties as a Special Agent include investigating violations of possession, distribution, receipt and production of child pornography, and I am empowered to investigate and make arrests for offenses involving the aforementioned offenses.  As an SA with HSI, I have received specialized training on how to conduct these investigations and am familiar with and have received training regarding federal laws relating to, among other things, the unlawful possession, distribution, and receipt of child pornography, 18 U.S.C. § 2252(a)(4)(B), possession of child pornography, and 18 U.S.C. §2252(a)(1) and (2), transportation and receipt of child pornography.  I have participated in child pornography investigations and have assisted in the execution of federal search warrants in connection with those investigations.

3.      I am a "Federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4.      The property to be searched, the Device, is an Apple iPhone model SE, IMEI/ESN# 355799075202901, S/N #DX3SW2SLH2XG, MEID #35579907520290, currently located in evidence storage at the Nashua, New Hampshire, Police Department, Panther Drive, Nashua, New Hampshire.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the

2

Nashua Police Department.  As noted below, the Nashua Police Department

obtained a Search Warrant for the Device and pursuant to that Search Warrant a

forensic examination of the Device was conducted.  However, the forensic

process used to conduct that examination should not have altered the content of

the Device in any way.

5.      On September 18, 2017, Detective Lombardi of the Nashua Police Department

applied to the 9th Circuit-District Division-Nashua, NH Court in Hillsborough County, Judge

James H. Leary, for a Search Warrant to search "an Apple iPhone SE, color black and gray"

which was the Device.  After reviewing the Application for Search Warrant and Supporting

Affidavit, which alleged that probable cause existed for the search of the Device for "evidence of

the crime of Endangering the Welfare of a Child or Incompetent, Class A Misdemeanor contrary

to New Hampshire Revised Statutes 639:3, I … " Judge Leary issued the Search Warrant.

6.      NH RSA 693:3, I states:

639:3 Endangering Welfare of Child or Incompetent

I.      A person is guilty of endangering the welfare of a child or incompetent if he

knowingly endangers the welfare of a child under 18 years of age or of an

incompetent person by purposely violating a duty of care, protection or support he

owes to such child or incompetent, or by inducing such child or incompetent to

engage in conduct that endangers his health or safety.

7.      The elements of the offense of endangering the welfare of a child or incompetent

are:

A.      The defendant owed a duty of care, protection or support to a child under 18

years of age or an incompetent person;

B.   The defendant purposely violated this duty of care, protection or support;

C.   By this conduct, the defendant endangered the welfare of the child or

incompetent.

8.     Copies of the above referenced State of New Hampshire Search Warrant for the Apple iPhone SE, the Device, and the Application for Search Warrant and Supporting Affidavit are attached as Exhibit #1.

9.     The Nashua Police Department executed that Search Warrant and has continued the investigation.  However, this Application contains only information that was available and known at the time that above referenced State Search Warrant was sought.  No evidence, other than what was known prior to the submission of that Search Warrant is being used in support of this Search Warrant Application.

10.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

11.     I submit that there is probable cause to believe that evidence of crime, contraband, and fruits of crime, specifically  violations of 18 U.S.C. § 2252(a)(4)(B), possession of child pornography, and 18 U.S.C. §§ 2252(a)(1) and (2), transportation and receipt of child pornography, are located on the Device, and that the Device was an instrumentality of those crimes in that it was intended for use, and was used, in committing those crimes.

12.     The information contained in this affidavit is based, in part, on my personal knowledge and information I have received from other law enforcement personnel, including the Nashua, NH Police Department.  This affidavit is submitted for the purpose of establishing probable cause to support the issuance of a search warrant.  While this affidavit contains facts relevant to the requested search warrant, it does not include each and every fact known to me, or

to other investigators, concerning this investigation.  That being said, I am not aware of any information that would contradict the information provided here, or would suggest that probable cause does not exist.

## RELEVANT STATUTES

13.     This investigation concerns alleged violations of 18 U.S.C. § 2252(a)(4)(B), possession of child pornography, and 18 U.S.C. §§ 2252(a)(1) and (2), transportation and receipt of child pornography, which prohibits a person from knowingly possessing or accessing images of sexually explicit conduct (child pornography) with the intent to view them, as well as transporting or receiving, distributing or possessing in interstate or foreign commerce, or by using any facility or means of interstate or foreign commerce, any visual depiction of minors engaging in sexually explicit conduct (i.e., child pornography).  The following definitions apply to this Search Warrant Application:

       a.     **"Child Pornography"**, as used herein, is defined in Title 18 United States Code § 2256 (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

       b.     **"Minor"** means any person under the age of eighteen years.  See 18 U.S.C. § 2256(1).

       c.     **"Sexually explicit conduct"** means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons

of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic

abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.  <u>See</u> 18

U.S.C. § 2256(2).

## **PROBABLE CAUSE**

14.     On September 18, 2017, at approximately 2:08 a.m. Nashua, New Hampshire

Police (NPD) officers made contact with Brenda Francisco, outside of her residence located at █

████████     Nashua, New Hampshire.  Brenda reported to NPD officers that she had

suspected her husband, Chad FRANCISCO, of having an extramarital affair, and that she had

looked through both his personal cellular phone, a white Samsung cellular phone, as well as his

work cellular phone, an Apple iPhone SE cellular phone, after he went to sleep, without his

knowledge.

15.     Brenda Francisco reported to NPD officers that while looking through Chad

FRANCISCO's work phone, the Device, she observed two text message conversations to

numbers that were unfamiliar to her.  Associated with those text message conversations she

observed photographs of her eight year old daughter that she described as being sexual in nature,

and appeared to have been sent to one of the unknown numbers.  While the Device was still in

her possession, Brenda Francisco proceeded to show Officer Quinlan of the NPD several images

and text messages which she observed on the Device.

16.     Officer Quinlan reported that Brenda Francisco handed him the Device on which

he observed a text message conversation with telephone number ███████████, and

photographs of what appeared to be an eight year old girl.  Officer Quinlan reported that the

photographs showed the girl fully clothed; however, the focus of the photos were the buttocks,

front of the genitals, and chest.  Officer Quinlan further reported that a conversation between

Chad FRANCISCO and the unknown number appeared to show that Chad FRANCISCO was soliciting pictures of young girls from the unknown number, as well as the person from the unknown number soliciting pictures from Chad FRANCISCO. Based on the information received from Brenda Francisco, and what he observed on the Device, Officer Quinlan terminated his examining the Device and collected it as evidence.

17.      Officer Quinlan reported that Brenda Francisco advised that she had two children, one an eight month old child, and the other an eight year old child, which she had removed from the residence after looking at Chad FRANCISCO's two cellular phones and shortly before speaking with the NPD. Officer Quinlan reported that Brenda Francisco advised that Chad FRANCISCO was alone in their apartment at that time.

18.      Brenda Francisco advised Officer Quinlan that Chad FRANCISCO had two additional electronic devices, an iPad located in a vehicle in the driveway, and a personal Samsung cellular phone located inside the apartment with Chad FRANCISCO.

19.      Officer Quinlan reported that Brenda Francisco granted permission to enter the home. Officer Quinlan reported that upon locating Chad FRANCISCO in the home, he immediately noticed a Samsung cellular phone, previously described by Brenda Francisco, on the bed next to CHAD FRANCISCO. Officer Quinlan reported that he seized the Samsung cellular phone due to the potential digital evidence on the phone, as well as the exigency that existed in that Chad FRANCISCO could potentially destroy the device or evidence.

20.      Officer Quinlan reported that upon making contact Chad FRANCISCO was informed that the NPD was investigating a serious matter and requested that he speak with detectives at the NPD. Officer Quinlan reported that Chad FRANCISCO was informed that he was free to decline the invitation to speak with detectives, and the decision to speak to detectives

was his decision to make.  Officer Quinlan reported that Chad FRANCISCO advised that he would like to speak with NPD officers, but that his "life was over," and he wanted to smoke a cigarette before departing for the NPD.  Officer Quinlan reported that he drove Chad FRANCISCO to the NPD and reminded him that he, Chad FRANCISCO, was accompanying him voluntarily.  Upon arrival at the NPD Chad FRANCISCO was shown to the lobby where he signed in as a visitor.  At no point that day was Chad FRANCISCO placed in restraints, told he was under arrest, or had his movements limited.  He was advised that he was not under arrest and that he was free to leave the NPD if he so chose.

21.    Prior to the arrival of Officer Quinlan and Chad FRANCISCO at the NPD, NPD detective McIver reported that she and NPD detective Lombardi conducted a voluntary interview of Brenda Francisco at the NPD, which was audio and video recorded.  Brenda Francisco advised detectives that she has two children: one an eight year old daughter, whose initials are A.M., and one an eight month old, whose initials are I.F.

22.    Detective McIver reported that Brenda Francisco advised that while looking for evidence that her husband, Chad FRANCISCO, might be cheating on her, she decided to look through his phone while he was sleeping.  Brenda Francisco advised that she first looked through Chad FRANCISCO's personal phone, where she discovered a new female on his Facebook account, and a text message from an unknown number.

23.    Detective McIver reported that Brenda FRANCISCO advised that she then went into the bathroom and retrieved Chad FRANCISCO's work cellular phone, the Device, and began to search through it.  Brenda Francisco advised that she observed a text message conversation between her husband, Chad FRANCISCO, and an unknown subject.  While continuing to view the conversation, Brenda Francisco advised that she observed pictures of her

8

eight year old daughter, some of which depicted her naked.  Brenda Francisco further explained

that she also observed pictures of another child around the same age.  Brenda Francisco advised

that the girls did not appear to know they were being photographed, as they did not appear to be

posing in any way.

24.     NPD detective McIver reported that Brenda Francisco advised that she did not

search through the entire thread of messages, but did observe a conversation between Chad

FRANCISCO and the unknown subject discussing trading their daughter's underwear to one

another.

25.     Brenda Francisco advised that after she observed the conversation between Chad

FRANCISCO and the unknown person, she removed her children from the home and reported

the incident to the police.

26.     I, Special Agent Perrella, viewed the audio and video recording of the interview

of Brenda Francisco at the NPD on 9/18/17, at 04:01 a.m.  Brenda Francisco was asked by NPD

detectives to clarify what she observed after she discovered pictures of her daughter on the

Device.  Brenda Francisco advised that the photos were "various states of her undressed, a lot of

her in her pajamas, and then some of her in bath time in the tub completely nude."  Brenda

Francisco further stated that she observed photos of other little girls that she had never seen

before, some which she described as "pornographic" material but which were not of her

daughter.  Brenda Francisco advised that the pictures (jpeg images) appeared to be obtained from

the internet.

27.     Brenda Francisco was asked to describe the picture of her daughter in more detail,

to which she replied that it appeared that "he," referring to Chad FRANCISCO, was trying to

take candid pictures of her.  Brenda Francisco further advised that she believed that "he,"

referring to Chad FRANCISCO was trying to take pictures of her "nude" without her realizing it.

28.     Brenda Francisco advised that the pictures of the other girls she observed were

her daughter's age, ranging in between the ages of six and nine, or six and ten.  Brenda Francisco

advised that all the pictures of her daughter were taken in her home.

29.     Detective Lombardi reported that on the same day, September 18, 2017, Chad

FRANCISCO agreed to provide a voluntary statement regarding the incident at the NPD, which

was both audio and video recorded.  Detective Lombardi reported that he asked Chad

FRANCISCO if he knew what they were there to talk about, to which Chad FRANCISCO

responded that he had an idea.  Chad FRANCISCO further explained that his wife, Brenda

Francisco, had gone through his phone.  Chad FRANCISCO advised that he has an eight year old

step-daughter, whose initials are A.M., and a new born baby, eight months old, whose initials are

I.F.

30.     I have viewed the video and audio recording of that interview and Chad

FRANCISCO became emotional while talking about his children.  Chad FRANCISCO then said

that he loved his children, and further stated, "I fucked up."  When Detective Lombardi asked

Chad FRANCISCO to clarify what he meant by "I fucked up" Chad FRANCISCO responded

that obviously they knew what they were there for, and further stated, "stupid shit."  Chad

FRANCISCO stated that he never laid a finger on his children.

31.     Chad FRANCISCO advised that he had been using his phone to exchange photos

of his wife, for pictures of another person's wife that he had met online through a Craigslist ad,

which the other individual had posted, but he did not know who the person was.  Chad

FRANCISCO explained that initially the photos that were exchanged were just normal pictures

of each other's wives, but eventually they began exchanging naked pictures of their wives. While discussing exchanging pictures of his wife, Chad FRANCISCO became uncomfortable and stated that he was ashamed. Chad FRANCISCO expressed that he was uncomfortable discussing the matter further while female NPD detective McIver was present. Detective McIver then excused herself from the room.

32.    Chad FRANCISCO advised that this was something that he had just started to do, and described it as "role play" or "fantasy," and was something he would not actually go through with because he loves his children and does not want anyone to touch them. Chad FRANCISCO explained that it was something he just got caught up in.

33.    Detective Lombardi asked Chad FRANCISCO what happened after he exchanged pictures of his wife, to which he replied, "More fantasy." And Chad FRANCISCO stated that "The truth has to come out."

34.    Chad FRANCISCO was asked if he exchanged pictures of his children, to which he responded, "Yes." Chad FRANCISCO further explained that at first they were normal pictures, everyday street pictures but explained that the person with whom he was exchanging pictures was sending him pictures of his children. Chad FRANCISCO then explained that the pictures turned into "inappropriate" pictures of children. Detective Lombardi asked Chad FRANCISCO to clarify what "inappropriate" meant, but did not receive an answer. Detective Lombardi asked Chad FRANCISCO if the children were naked, to which Chad FRANCISCO replied that they were not at first, but eventually were naked. Chad FRANCISCO explained that the children in the pictures were not doing anything and that no one was doing anything to the children.

35.    Detective Lombardi asked Chad FRANCISCO what instigated the exchange of pictures of nude children.  Chad FRANCISCO explained that after exchanging photos of his wife, the other person asked if he had any children, and the other person sent pictures of his children to Chad FRANCISCO.  Chad FRANCISCO explained that he then sent pictures of his children to the other person.

36.    Chad FRANCISCO claimed that the pictures that were sent/received were of the children clothed, but eventually turned into naked pictures of the children.  Chad FRANCISCO claimed to have received pictures, from the other person, of female children, ages ten and seventeen years.  Chad FRANCISCO explained that the female children did not appear to know that their photos were being taken, and appeared to be getting ready to take a shower.

37.    Chad FRANCISCO claimed that he used his iPhone to exchange pictures with the other person.  The only iPhone of which law enforcement is aware Chad FRANCISCO possessed was the Device.

38.    Chad FRANCISCO was asked if he could provide any additional information regarding the person with whom he was exchanging photos and Chad FRANCISCO explained that he had just contacted that person through Craigslist, had no further information, and had only exchanged pictures with one person.

39.    On November 29, 2017, I, and United States Attorney's Office Victim Witness Specialist, Jennifer Hunt, interviewed Brenda Francisco.  At the beginning of the interview I told Brenda Francisco that the interview would be limited to asking questions about what she had seen only up to the time the NPD took possession of the Device on the morning of September 18, 2017, and that I wanted her to base her answers exclusively on what she had seen and heard up to that time.  Brenda Francisco advised that on September 17, 2017, she had been arguing with her

husband, Chad FRANCISCO, throughout the day regarding marital issues, and noticed that he was angry and not himself.  Brenda Francisco explained that after Chad FRANCISCO went to sleep (approximately 9:30 p.m.), she heard multiple "dings" on his personal phone, indicating that he was receiving some sort of notifications.  Brenda Francisco looked at the phone and noticed a message from an unknown number.  Brenda Francisco advised that this concerned her due to past marital infidelity.

40.     Brenda Francisco explained that she then went into the bathroom where she knew that she would find Chad FRANCISCO's work cellular phone, the Device, in his pants.  Brenda Francisco advised that she removed the phone from his pants and started looking through it. Brenda Francisco immediately noticed two numbers with text messages that she did not recognize.  Brenda Francisco advised that the numbers did not contain any specific contact information.  Brenda Francisco then opened the top text message thread she saw, and proceeded to scroll down to the bottom of the message.  Brenda Francisco advised that she swiped down twice on the thread, and then observed pictures of her eight year old daughter, A.M.

41.     Brenda Francisco explained that the first photo she observed of A.M. appeared to have been taken in their bathroom, with A.M. in the shower.  Brenda Francisco further advised that she observed the top of A.M's bare back, from what appeared to be an "aerial view" of A.M. washing her hair.  Brenda Francisco then observed a second photo of A.M., which showed a full-frontal image of A.M. with her arms crossed, and she appeared to be trying to create "cleavage." Brenda Francisco advised that the aforementioned photo of A.M. showed her bare breasts, nipples, and vagina.  Brenda Francisco advised that it appeared to her that A.M. might have been asked to pose for the photo.

42.     Brenda Francisco explained that after she observed the second photo of A.M., she then opened the second message thread from the other unknown number.  Brenda Francisco advised that she observed multiple photos of A.M and her infant daughter, I.F., fully clothed, where they appeared to be playing in the living room.  Brenda Francisco advised that A.M. was dressed in a t-shirt and panties.

43.     Brenda Francisco explained that as she continued to search through the message thread, she observed photos of other children.  Brenda Francisco explained that she observed one photo of a female, approximately ten years old, lying flat on a bed with her hands tied over her head, her legs spread and a gag ball in her mouth.  Brenda Francisco advised that she observed the female child's breasts and vagina, and because the female child's legs were spread, she saw everything from the vagina to the anus.

44.     Brenda Francisco then observed a second photo of another female child, approximately ten to twelve years old, undressed, on her knees, looking up at the camera. Brenda Francisco explained that the female child appeared to have been "Dolled-up" to make her look even younger.  Brenda Francisco advised that after observing the aforementioned photo, she shut off the phone, the Device, and hid it in her truck.

45.     Brenda Francisco advised that she also observed a text message conversation between Chad FRANCISCO and one of the unknown numbers, discussing exchanging the dirty panties of each of their children with each other.

46.     Brenda Francisco explained that she then gathered her children and removed them from the residence.  Brenda Francisco advised that after she secured her children at her mother's house, she returned to her residence where she made contact with the NPD.  Brenda Francisco advised that she showed an NPD officer Chad FRANCISCO's phone, and a picture of A.M. in

the tub.  That NPD Officer's police report does not reference having seen a picture of an unclothed child but instead said that the pictures he saw were of clothed children.  His report also said he did not search the Device beyond what Brenda Francisco had shown him.  Brenda Francisco advised that she read the NPD officer a text message from one of the unknown numbers which said, "Now she just needs us to take care of her."  Brenda Francisco advised that the NPD took custody of Chad FRANCISCO's phone, the Device, and that NPD then made contact with Chad FRANCISCO inside the residence.   Both Brenda Francisco and Chad FRANCISCO were later interviewed by NPD detectives.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO POSSESS, RECEIVE, OR DISTRIBUTE CHILD PORNOGRAPHY

47.     Based on my previous investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who view and/or possess, and/or transmit and/or receive images of child pornography:

a.     Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual explicit conduct or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity. Individuals who have a sexual interest in children or images of children typically retain such images for many years.

b.      Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer or cellular telephone.  These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence or inside the

possessor's vehicle, to enable the individual to view the child pornography images, which are valued highly.

      c.     Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. Forums, such as chat rooms, bulletin boards, newsgroups or IRC chat rooms have forums dedicated to the trafficking of child pornography images.

48.    Based on the information provided by Brenda Francisco, as well as admissions by Chad FRANCISCO, I submit that there is probable cause to believe that Chad FRANCISCO has possessed and/or produced child pornography.  I know, based on my training and experience, that people who have a demonstrated sexual interest in children and child pornography often maintain collections of images of child pornography. I am therefore requesting authority to search the Device for evidence of any child pornography and evidence relating to the possession, and distribution of any child pornography.

## TECHNICAL TERMS

49.    Based on my training and experience, I use the following technical terms to convey the following meanings:

50.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

51.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

52.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other

17

digital data.  Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or

miniature hard drives.  This removable storage media can also store any digital

data.  Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

53.     GPS:  A GPS navigation device uses the Global Positioning System to display its

current location.  It often contains records the locations where it has been.  Some

GPS navigation devices can give a user driving or walking directions to another

location.  These devices can contain records of the addresses or locations involved

in such navigation.  The Global Positioning System (generally abbreviated

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that

are publicly available.  A GPS antenna on Earth can receive those signals.  When

a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

54.     PDA:  A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.  PDAs

usually include a memory card or other removable storage media for storing data
and a keyboard and/or touch screen for entering data. Removable storage media
include various types of flash memory cards or miniature hard drives. This
removable storage media can store any digital data. Most PDAs run computer
software, giving them many of the same capabilities as personal computers. For
example, PDA users can work with word-processing documents, spreadsheets,
and presentations. PDAs may also include global positioning system ("GPS")
technology for determining the location of the device.

55.     Based on my training, experience, and research, and from discussions with others
in law enforcement familiar with iPhone technology, I know that the Device has
capabilities that allow it to serve as a wireless telephone, a digital camera, a
portable media player, a GPS navigation device, and a PDA. In my training and
experience, examining data stored on devices of this type can uncover, among
other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

56.     Based on my knowledge, training, and experience, I know that the Device can
store information for long periods of time. The Device is designed to access the
Internet and things that have been viewed via the Internet are typically stored for
some period of time on internet enabled devices such as the Device here. This
information can sometimes be recovered with forensics tools.

57.     *Forensic evidence.* As further described in Attachment B, this application seeks
permission to locate not only electronically stored information that might serve as
direct evidence of the crimes described on the warrant, but also forensic evidence

that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

58.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

59.  *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**<u>CONCLUSION</u>**

60.  Based on the foregoing, I submit that there is probable cause to believe evidence of crime, contraband, and fruits of crime, specifically  violations of 18 U.S.C. § 2252(a)(4)(B), possession of child pornography, and 18 U.S.C. §§ 2252(a)(1) and (2), transportation and receipt of child pornography, are located on the Device described in Attachment A, and that the Device was an instrumentality of those crimes in that it was intended for use, and was used, in committing those crimes. I respectfully request that this Court issue a search warrant for the Device, authorizing the seizure and search of the items described in Attachment B.

Sworn to under the pains and penalties of perjury.

/s/ Michael Perrella
Michael Perrella
Special Agent
Homeland Security Investigations

Sworn to and subscribed before me this the 1st day of December, 2017.

   /s/ Andrea K. Johnstone
Andrea K. Johnstone
United States Magistrate Judge

**<u>ATTACHMENT A</u>**

The property to be searched, the Device, is an Apple iPhone SE-IMEI/ESN#

355799075202901, S/N #DX3SW2SLH2XG, MEID #35579907520290 Currently Located in

evidence storage at the Nashua, NH, Police Department, Panther Drive, Nashua, NH.

This warrant authorizes the forensic examination of the Device for the purpose of

identifying and seizing the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. § 2252(a)(4)(B), possession of child pornography, and 18 U.S.C. §§ 2252(a)(1) and (2), transportation and receipt of child pornography since September of 2017, including:

1.    Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, e-mail messages, chat logs, text messages, electronic messages, or other digital data files) pertaining to the production and possession of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

2.    In any format and medium, all originals, computer files, and copies of child pornography as defined in 18 U.S.C. § 2256(8) and visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), including GPS location data that may show the location at which the image was created or from which it had been sent.

3.    Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the owner of the Device for the purpose of receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs, text messages, electronic messages, and other digital data files) concerning communications between FRANCISCO and other parties related to the violations described in the warrant.

5.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs, text messages, electronic messages, and other digital data files) concerning or relating to child pornography or membership in online groups, clubs, or services that provide or make accessible child pornography to members.

6.    Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, e-mail messages, chat logs, text messages, electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

7.    Any and all visual depictions of minors.

8.     Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs, text messages, electronic messages, and other digital data files), pertaining to use or ownership of the Device described above.

9.     Any and all documents, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

As used above, the terms "records" and "information" include all of the foregoing items of

evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage and any photographic form.

3